IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

QUINNTON BROWN (*aka* Earin Davis)[1]    *

    Plaintiff    *

v.    *    Civil Action No. AW-13-cv-463

ART WALENSTEIN, *et al.*    *

    Defendants    *

\*\*\*

## MEMORANDUM

Pending is Defendants' Motion to Dismiss or for Summary Judgment. ECF No. 14. Plaintiff opposes the motion (ECF No. 19) and Defendants have filed a Reply thereto (ECF No. 20). The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

## Background

At all times relevant to the Complaint, Plaintiff was incarcerated at the Montgomery County Correctional Facility (MCCF).[2] He alleges that on February 29, 2012, he was assaulted by Defendant Martain Che, a correctional officer at MCCF. Plaintiff claims the altercation occurred after he asked Che for a grievance form so he could file a complaint against Che for the "derogatory" manner in which Che had addressed him. Che allegedly refused to provide the form and instead ordered Plaintiff to return to his cell or "lock-in." Plaintiff claims he felt Che was being "overtly authoritative and unjust" by ordering him to lock in to his cell "for no reason." ECF No. 10 at p. 5. Plaintiff claims he began walking past the officer in the direction of his cell, but Che yelled for him to come back. When Plaintiff turned around he claims Che hit

---

[1] The Clerk shall amend the docket to reflect Plaintiff's alias.

[2] Plaintiff is now incarcerated in the Maryland State Division of Correction at Maryland Correctional Institution Jessup (MCIJ) under the name Earin Davis. His request for injunctive relief in the form of a transfer from MCCF is therefore moot. *See* ECF No. 1 and 10.

him twice in the face with his fists. In order to "ward off any further unwarranted abuse," Plaintiff claims he fought back and knocked Che to the ground. He further claims that once Che was on the ground, Plaintiff moved away to put space between him and the officer. He states, however, that Che got up from the floor and came at Plaintiff with a chair and Plaintiff was able to fend his attacker off again. Plaintiff asserts that once the "situation was brought under control" he laid down on the ground in a manner depicted in the inmate guidebook. Plaintiff claims he suffered a broken tooth, multiple lacerations on the inside of his mouth, and swelling of his eye, upper lip, and jaw. *Id*. pp. 5 – 6.

Following Che's assault, Plaintiff alleges Che falsified documents charging Plaintiff with an institutional infraction for assaulting an officer. ECF No. 1 at p. 4 and Attachment 1. Plaintiff claims that on March 9, 2012, after exhausting administrative remedies, he asked to file criminal charges against Che. When the warden found out about his intentions, the warden had Plaintiff charged with criminal assault charges. ECF No. 10 at p. 6. Plaintiff stood trial for assault on a correctional officer and was subsequently found not guilty by a jury on July 31, 2012, in the Circuit Court for Montgomery County, Maryland. ECF No. 10 at p. 6. Despite being found not guilty of the criminal charges, Plaintiff states he was kept on segregation from the date of the incident because he assaulted a staff member. *Id*. He asserts that Defendants Warden Green and Deputy Warden Maligarie improperly kept him on segregation status "even though he was found to be not guilty of the assault on Martain Che in the Montgomery County Circuit Court." ECF No. 1 at p. 4. Plaintiff claims he suffered mild depression as a result of being so assigned and that he was only allowed to attend the law library once every two weeks for a period of 15 minutes and was required to wear handcuffs and shackles while in the library. *Id*. at p. 5. He claims he was left on segregation as a means of retaliation by Green and Maligarie and he

maintains that retaining him on lock up for this reason violated his Eighth Amendment rights. ECF No. 10 at p. 6.

Plaintiff adds that the time he was allotted in the law library was inadequate to allow him to "prepare a defense" for his original criminal charges. He adds that segregation inmates are told they can order legal material from the law librarian, but that the requests take anywhere from three to six weeks to receive. He claims he was told attempts were being made to rectify the problems; however, nothing was done. He asserts the inadequate time to use the law library was a violation of his Fourteenth Amendment rights. ECF No. 10 at p. 7.

On August 30, 2012, Plaintiff claims he was assaulted by Defendant Corporal Wagstaff when Wagstaff hit Plaintiff in the throat with his forearm. Plaintiff alleges Wagstaff pushed him and when Plaintiff asked why he had done so, Wagstaff replied that he was not Che and struck Plaintiff in the throat. ECF No. 10 at p. 7. He claims Green refused to respond to his grievance concerning the assault by Wagstaff and Defendant Art Walenstein did not respond to his appeal regarding Green's actions. ECF No. 1 at p. 5. Plaintiff further alleges the administration of MCCF "deliberately misled the courts to believe that [he] was transferred out of the jail when he was in fact being held in segregation." *Id*.

As relief Plaintiff seeks to be transferred from MCCF and to be "compensated" for pain and suffering resulting from the physical assault as well as the conditions under which he was confined. He seeks "in excess of $200,000 dollars" in both punitive and compensatory damages. ECF No. 10 at p. 7.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

Excessive Force Claim[3]

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). The court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkens v. Gaddy*, 599 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 34.

The first of Plaintiff's excessive force claims involved Defendant Che and was captured on video. Defendants have submitted a copy of the video. Plaintiff has viewed the video and does not dispute that it is an accurate portrayal of the events. ECF No. 14 at Ex. E. The video does not support Plaintiff's version of the events; rather, it establishes Plaintiff as the initial aggressor. Plaintiff, who readily admits being familiar with the MCCF inmate handbook, moved aggressively into an area of Che's work station that is out-of-bounds for inmates as defined by the handbook. In his affidavit, Che relates the following sequence of events:

---

[3] The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "Due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992), *citing Martin v. Gentile*, 849 F. 2d 863, 870 (4th Cir. 1988).

5

> On February 29, 2012, at approximately 3:56 p.m., I was working in the dayroom of W2.4 pod. I was at the officer's desk when an inmate, later identified as Earin Davis, approached the desk. I did not know, nor did I have any interaction with, this inmate before. Inmate Davis asked if the movement list (his housing assignment) was available yet. I responded, "no." Inmate Davis turned as if he was about to walk away from the desk, but then turned back toward the desk and asked the same question again, I said, "I just told you it is not available at this time." Inmate Davis then said, "You don't have to yell, I'll smack the shit out of you." I had not yelled or raised my voice. Based on this physical threat, I ordered Inmate Davis to lock into his cell. Inmate Davis said, "what?" and immediately proceeded to come around the restricted area behind the officer's desk with his fists clenched. As this was happening, I tried to call for assistance on my hand-held radio, but when I took my finger off the radio button, I got the signal that I had a dead battery. By this point, Inmate Davis was behind me so I faced his direction because he came toward me in a threatening manner. At this point, because I was alone with all of these inmates and I knew that no one was coming to assist me because my call for assistance failed, I feared for my physical safety. I did not have time to pull out my OC spray because Inmate Davis came around the officer's desk too fast as I was attempting to call for assistance. Plus, Inmate Davis was so close to me, I feared he would either grab the canister from my hand and use it on me, or that if I sprayed him, I would also [be] affected by the OC spray . . . . This would have been a very dangerous situation since I was locked into W 2-4 with a large number of inmates without any other correctional officers. I had to make a split-second decision based on my training, I struck Inmate Davis one time with my fist to his face, but instead of backing away and leaving the restricted area, Inmate Davis jumped on me and began punching me with his closed fists on my head and face. I fell backwards and tripped over the wheeled-chair at the officer's desk, and then fell to the floor. When I fell to the floor, I landed with my head in the doorway of the office behind me, and Inmate Davis jumped on me again and tried to slam the door closed on my head. At that point, Cynthia Boyd, a counselor, came out of her office and yelled for Inmate Davis to "stop," and then one of the medical staff in the area activated the duress alarm for assistance. That is when Inmate Davis stopped his attack on me, went to the main day area of W 2-4, and laid face down on the floor with his hands behind him as assistance arrived.

ECF No. 14 at Ex. F, pp. 1 – 2. Although the video of the incident does not contain audio, the actions of the parties closely track the description provided by Defendant Che and are echoed in the affidavit of Cynthia Boyd. *See id*. at Ex. J. The dialogue between Plaintiff and Che is inconsequential to the issue of whether excessive force was used against Plaintiff. The aggressive approach made by Plaintiff into an unauthorized area near Che was enough to justify

6

the initial force used by Che.   Plaintiff's assertion that his hands did not come up above his waist until Che hit him, does not negate his entrance into an unauthorized area.  Further, Plaintiff's assertion that Che picked up the chair in order to assault him with it is without significance in this case as the chair was not used to assault Plaintiff.  Even if Che had secured the chair for his protection, however, he did so following Plaintiff's attempts to slam his head in the doorway of a nearby office.  Given Plaintiff's actions, Che would have been justified in picking up the chair to either protect himself or to remove it from the pathway of approaching assistance.

Plaintiff's claim that he was physically injured during the fray is not supported by his medical records.  ECF No. 14 at Ex. K.  His claim that he broke a tooth is refuted by Defendants who claim Plaintiff has a long history of dental problems including multiple decayed and fractured teeth, pre-existent to the altercation with Che.  *Id*. at p. 2.  Plaintiff does not specify, either in his Complaint, Amended Complaint, or Opposition Response, which tooth was cracked as a result of the incident involving Che.  ECF No. 1, 10, and 19.  Additionally, Defendants assert Plaintiff was seen for his complaint that he was hit in the jaw, but no injuries were noted.  ECF No. 14 at Ex. K, p. 1.   While the absence of a physical injury does not exonerate application of excessive force, it is evidence that the force used was the minimum necessary to restore discipline. The evidence submitted supports a finding that Che did not utilize force for the mere purpose of causing harm to Plaintiff and thus Che is entitled to summary judgment on the claim against him.

The second claim of excessive force allegedly involves Defendant Wagstaff and occurred on August 30, 2012.  The Complaint provides virtually no details regarding the encounter between Plaintiff and Wagstaff which led to the use of force against Plaintiff.  Wagstaff,

7

however, asserts the encounter started when he came to Plaintiff's cell to inspect it and, per the usual practice, handcuffed Plaintiff behind his back through the food slot. ECF No. 14 at Ex. H. At that time, Wagstaff asked for Plaintiff's door to be opened and he noticed a towel lying on the floor directly in front of the cell door. He explains that inmates are prohibited from keeping items on the floor of their cells because they can be used to conceal contraband or, in the instance where the item is near the door, used to prevent the automated door from locking properly. *Id*.

Initially, Wagstaff stepped over the towel and entered the cell for inspection, but upon completing his inspection, he kicked the towel out of the cell door into the passageway. When Plaintiff protested,[4] Wagstaff explained he was taking the towel because it was on the floor. Plaintiff stated the towel was his "second towel." Wagstaff put the towel back, but instructed Plaintiff to put it away properly. After Plaintiff's cell door closed, Wagstaff observed Plaintiff kick the towel back by the cell door again. Wagstaff again ordered Plaintiff's door opened, stepped inside the cell, and bent over to pick up the towel. When Wagstaff had his hand on the towel, Plaintiff "took a few quick steps toward him" and stepped on the towel. As he stepped forward, Wagstaff claims Plaintiff stated, "You all some bitches." ECF No. 14 at Ex. H, p. 2. Because Wagstaff was in a vulnerable position and he knew Plaintiff had a history of assaultive behavior, he believed Plaintiff was about to kick or knee him in the face. *Id*. To defend against such an assault, Wagstaff stood up and pushed Plaintiff back with his forearm against Plaintiff's upper chest. Wagstaff states Plaintiff took approximately four to five steps backward after he was pushed and explains his goal was to get Plaintiff a safe distance away to give himself time to react if Plaintiff approached again. *Id*. Wagstaff claims Plaintiff remarked, "Oh, if these cuffs was off, it would be a different story." *Id*. Wagstaff states he knew that Plaintiff had assaulted

---

[4] According to Wagstaff, Plaintiff stated, "why are you taking my fucking towel?"

another officer, but did not know that officer's name at the time. He responded to Plaintiff's threat by stating, "I am not him" and closed the cell door. *Id*. at pp. 2 – 3. Plaintiff then refused to allow Wagstaff to remove his handcuffs through the food slot in the cell door. Officer Robert VanDenEngel, who was in the area, removed Plaintiff's handcuffs and no further incidents occurred. *Id*.

In his Response, Plaintiff disputes that his cell door was opened a second time because he kicked the towel toward the door again; rather, he claims Wagstaff ordered it opened after he remarked that Wagstaff was being petty about the towel. ECF No. 19 at pp. 15 – 16. He claims Wagstaff then ordered the door opened and "stepped up in my face." *Id*. at p. 16. Plaintiff states that he did not move when Wagstaff came into the cell and that Wagstaff then pushed him backwards. *Id*. When Plaintiff asked him why he did that, he claims Wagstaff replied, "I am not Che and you (sic) not goin (sic) to do nothing!" Plaintiff asserts the matter regarding the towel was, in his opinion, childish and immature. *Id*. at p. 15.

It is not the province of this Court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). This is particularly applicable in instances where the physical safety of correctional officers or the security of the facility is at issue. The undisputed facts establish, at a minimum, that Plaintiff did not allow Wagstaff his personal space when he entered Plaintiff's cell a second time to retrieve the towel. *See* ECF No. 19 at p. 16 ("I did not move."). The decision to prohibit towels from being on the floor near a cell door is a security decision. Additionally, as Wagstaff explains in his affidavit,

> As part of our training as correctional officers, we are trained to maintain our personal space, which is based on what each individual correctional officer, based on his skill and comfort level, feels is a safe distance to be maintained

9

>     from inmates in order to be able to respond with defensive tactics when
>     necessary for our physical safety.

ECF No. 14 at Ex. H, p. 3. Wagstaff's action of pushing Plaintiff backward was minimal force and was employed to maintain discipline. Wagstaff is, therefore, entitled to summary judgment in his favor.

## Retaliation Claim

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *Compare Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACL U of Maryland, Inc. v. Wicomico County*, Md. 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) quoting *Adams v. Rice*, 40 F.3d 72,74 (4th Cir. 1994).

To make out a prima facie case of retaliation, Plaintiff has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). In the prison context, Plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 & n. 4 (9th Cir.1985). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id*. at 532. After Plaintiff makes a prima facie showing, the burden shifts to Defendants to demonstrate that they would have reached the same decision even in the absence of Plaintiff's constitutionally protected conduct. *Mt. Healthy*, 429 U.S. at 287.

Plaintiff's retaliation claim is that he was kept on "lock-up" despite being found not guilty of criminal charges related to the assault on Defendant Che. ECF No. 10. Plaintiff does not, however, have a constitutional right to be released from lock-up under the circumstances described. The quantum of proof to support a constitutionally valid prison disciplinary finding of guilt is "some evidence," a much lower standard than that required to support a criminal conviction. *See Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985). In addition, there is no evidence that Plaintiff's assignment to lock-up was unrelated to the preservation of internal order and discipline; rather, there is ample evidence to support the opposite conclusion. His retaliation claim, therefore, fails.

11

Access to Courts Claim

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997), quoting *Lewis*, 518 U.S. at 355. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 352-352.

In *Christopher v. Harbury*, 536 U.S. 403, 415 (2002), the Court characterized access-to-the courts claims as being in one of two categories. *Id* at 413. The first, termed "forward looking claims," are cases where official action frustrates a plaintiff's ability to bring a suit at the present time. *Jennings v. City of Stillwater*, 383 F.3d 1199, 1208-09 (10th Cir. 2004). The second class, termed "backward looking claims," arise when a Plaintiff alleges that a specific claim "cannot be tried (or tried with all the evidence) [because past official action] caused the loss or inadequate

12

settlement of a meritorious case." *Id*. at 1209. In this way, the official action is said to have "'rendered hollow [the plaintiff's] right to seek redress'" in the courts. *Id*. (quoting *Christopher*, 536 U.S. at 415 (brackets in original) (internal citations omitted)).

Whether the claim is forward or backward looking, a prisoner claiming he was denied access to the courts must ultimately prove he suffered an actual injury by showing that the defendant's acts hindered his ability to pursue a non-frivolous legal claim. Conclusory allegations are not sufficient in this regard. *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not even mention the point on appeal). The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415.

Plaintiff must establish that his underlying claim was "non-frivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. at 415. "[T]he predicate claim [must] be described well enough to apply the 'non-frivolous' test and to show the 'arguable' nature of the underlying claim is more than hope." *Id*. at 416 (footnote omitted). A prisoner's right to access the courts does not include the right to present frivolous claims. *Lewis v. Casey*, 518 U.S. at 353 & n. 3. It is not enough that a prisoner is prevented from challenging his conviction. He must also show that his claim had merit.

Plaintiff claims he was not provided adequate time in the prison library to prepare for his criminal case. ECF No. 1 and 10. He does not explain what materials he was denied, whether he missed a filing deadline, or how his criminal case was adversely affected.[5] Defendants assert that Plaintiff visited the library on a regular basis when he was assigned to administrative segregation and that he made two written requests to the law librarian, only one of which was for

---
[5] Plaintiff was represented by counsel in his pending criminal case. *See* ECF No. 14 at Ex. A and B.

an actual document, a newspaper article. ECF No. 14 at Ex. C. A response was provided to both of Plaintiff's requests, one within six days and the other within one day. *Id.* Plaintiff disputes that he made only two requests, claiming instead he made over 27 requests for materials. ECF No. 19 at p. 14. Plaintiff does not, however, state how he was injured by the alleged failure to provide materials or access to the library. Absent an actual injury to his ability to assert a meritorious claim, Plaintiff's claim fails.

**Conclusion**

Having determined that the undisputed facts do not support a finding of a constitutional rights violation, it is clear to the Court that Defendants are entitled to judgment in their favor on all claims asserted. A separate Order follows.


October 15, 2013                                                    /s/
                                                        Alexander Williams, Jr.
                                                        United States District Judge